UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 MAY 29  PM 3: 54

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 5:13-cr-145 |
| | ) |
| MAMIE ALLEN | ) |

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
(Doc. 19)

This matter came before the court on April 9, 2014 for an evidentiary hearing on Defendant Mamie Allen's Motion to Suppress Evidence. (Doc. 19.) Defendant contends that her encounter with two federal agents that occurred outside a residence in Rutland, Vermont was not consensual, but rather was a seizure unsupported by a reasonable suspicion of criminal activity. She seeks suppression of all evidence gathered as a result of the alleged unlawful seizure, including her subsequent statements at a police station which she claims are tainted by the unlawful seizure.

Post-hearing, Defendant submitted a transcript of a police cruiser video that depicts DEA Special Agent Thomas Doud's interaction with Defendant's travelling companions on the evening in question. Defendant contends that Agent Doud's statements are indicative of the non-consensual nature of her interaction with law enforcement. The court took the matter under advisement on April 29, 2014.

Defendant is charged in a one count indictment with possession of heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C).

The government is represented by Assistant United States Attorney Kevin J. Doyle. Defendant is represented by Maryanne E. Kampmann, Esq. and William V. Cristman, Esq.

I.      **Findings of Facts.**

On the evening of October 9, 2013, Special Agent Doud and FBI Special Agent Christopher Destito were engaged in surveillance of the Castleton, Vermont Amtrak station based upon information that drug couriers were using Amtrak trains and other sources of mass transit to transport drugs from source cities to Vermont. Because the Rutland, Vermont Amtrak station was often under surveillance by law enforcement, informants had advised the agents that drug couriers were disembarking at other stations, including the Castleton station, to avoid detection. In the previous year-and-a-half, law enforcement averaged two seizures per month of heroin and crack cocaine from individuals using public transportation to travel to Vermont. On the day in question, however, the agents had no specific information that an individual transporting drugs may be arriving at the Castleton Amtrak station.

The agents arrived at the station in an unmarked vehicle at approximately 8 p.m. and parked in the west parking lot, where at least two other vehicles were parked. In accordance with his customary practice, Agent Destito walked around the station before the arrival of the train and noticed vehicles parked in the paved west parking lot. Agent Destito observed a lone vehicle parked in the east parking lot, which is a gravel lot with only one street light. Based on his training and experience, Agent Destito was aware that persons picking up drug couriers may await their arrival in a parking lot, rather than risk being associated with the courier if he or she is apprehended while disembarking from a train or bus.

Agent Destito, who was carrying a notebook, walked around the lone vehicle and observed that the female operator of the vehicle avoided making eye contact with him. He observed that the vehicle's male passenger also avoided eye contact and shifted his body further into his seat and looked over his shoulder. According to Agent Destito, it was "apparent" that these individuals were "nervous" that he might be law enforcement, although he was not in uniform. (Tr. 4/9/14 at 13:18-23.) Brenda Emery, the female operator, credibly testified that she saw Agent Destito, but believed he worked for the Amtrak station. She did not try to avoid eye contact with him but, instead, was making

room in her vehicle for Defendant. Ms. Emery had agreed to pick up Defendant at the
Castleton Amtrak station for an acquaintance who claimed Defendant was his aunt.

Agent Destito returned to the agents' vehicle and informed Agent Doud that he
was "very suspicious" of the vehicle in the east lot. *Id.* at 14:7-10. Agent Doud agreed
that it was "interesting and suspicious" and "strange" that this vehicle was parked in that
location and that the occupants were acting nervous. *Id.* at 81:6-10. He had never seen
anyone park in that location before this incident. He described his suspicion as follows:

> One of the reasons would be that they're aware that they're in a high risk
> situation in that they're about to pick up somebody who is transporting
> illegal narcotics, and they want to sit back on the edges of the action, if you
> will, to see if the courier has any type of problem or contact with law
> enforcement. And of course [they] wouldn't want to be associated with
> that or near that.

*Id.* at 81:18-25.

When the train arrived shortly thereafter, Agent Doud stood on the east side of the
platform, and Agent Destito stood on the west side. Agent Destito noted that there were
people waiting on the platform to greet the arriving passengers. Neither of the two
occupants of the vehicle in the east lot came to the platform for the train's arrival, which
the agents thought was behavior "consistent with not wanting to associate yourself with a
courier." *Id.* at 15:15-16. Agent Destito conceded that there were also non-suspicious
reasons for this behavior.

The agents watched the train passengers disembark. They did not perceive
anything suspicious about Defendant, who is in her mid-forties and was dressed
appropriately for the weather, other than she had no apparent luggage beyond her purse.[1]
Although the agents did not know where Defendant had traveled from, they knew that the
train originated in Philadelphia and traveled through New York City and that both are
considered "source cities" which provide narcotics to Vermont.

---

[1] Agent Destito credibly testified that drug couriers often wear heavy clothing to conceal
narcotics and weapons and do not carry traditional luggage. He also credibly testified that, at
times, drug traffickers choose inconspicuous drug couriers to avoid detection.

The agents watched Defendant walk around the west side of the platform towards the front of the depot. Agent Doud then walked from the east side of the platform, to the east parking lot, to record the license plate number of the lone vehicle parked there. Agent Doud observed that the vehicle's occupants were "watching him very closely" and that "both heads were following him" when he walked behind the vehicle. *Id.* at 17:4-8. As Agent Doud returned to his own vehicle, he saw Defendant walk towards the lone vehicle in the east parking lot. He did not see Defendant get into the vehicle, but he assumed she did so as that was the only vehicle in the east lot.

The agents discussed their observations and decided to follow the vehicle in which they believed Defendant was a passenger. As the lone vehicle proceeded east towards Rutland, Agent Doud contacted the Rutland Police Department to check the license plate number he had recorded. Dispatch advised that the plate was associated with a residence at 76 Traverse Place in Rutland and that the vehicle was registered to Brenda Emery, who had no criminal record. Based upon prior experience, the agents were aware of allegations of drug trafficking in the "70 portion" or "70s block" of Traverse Place, including a state search warrant that had been executed for a residence in that area. The agents were also aware that 76 Traverse Place was within blocks of the Rutland Amtrak station. They considered this suspicious because Defendant could have disembarked at the Rutland Amtrak station and walked to 76 Traverse Place, instead of being picked up in Castleton. While following Ms. Emery's vehicle, the agents did not observe any traffic violations. They nonetheless requested assistance from the Rutland Police Department to ensure that there was an officer present for each occupant in the vehicle in the event of questioning or an arrest. In addition, because two of the occupants of the allegedly suspicious vehicle were female, they asked that a female police officer provide the requested assistance.

At 76 Traverse Place, Ms. Emery parked her vehicle on the west side of her driveway, parallel to her porch, as she customarily does so that there was enough room for another vehicle to park behind or beside her vehicle. Agent Destito parked the agents' vehicle in front of 76 Traverse Place in a manner that blocked a portion of the

driveway to 76 Traverse Place, but which would have permitted Ms. Emery's vehicle to leave the driveway with some maneuvering.

Unaware that the agents had followed her vehicle from the Castleton Amtrak station, Ms. Emery prepared to exit her vehicle. In doing so, she noticed the agents exiting their own vehicle and stated to her fellow occupants: "the train people followed us." *Id.* at 181:7.

Agents Doud and Destito were dressed in plain clothes, with no visible law enforcement insignia. Both agents were armed, but their firearms were not visible. As they approached Ms. Emery's vehicle, Agent Destito told the vehicle's occupants, "let me see your hands," or "just keep your hands where I can see them," or words to that effect. *Id.* at 58:2; 173:20. Agent Doud stood on the operator's side of the vehicle while Agent Destito stood next to Defendant, who was exiting from the front passenger seat. Agent Destito identified himself as an FBI agent and asked if Defendant would be willing to speak with him. Defendant answered in the affirmative. Agent Destito asked Defendant if she would step out of the vehicle, and she agreed to do so. During this time, Ms. Emery observed Agent Destito talking with Defendant in a conversational tone.

Agent Destito and Defendant walked from Ms. Emery's vehicle to where the agents' vehicle was parked.[2] Agent Destito asked Defendant why she had travelled to Vermont, and Defendant responded that she was visiting her niece. He explained to Defendant that Rutland was experiencing "a significant problem with illegal narcotics" and that the agents were "trying to make a push to try to slow that or curb that flow of illegal narcotics." *Id.* at 26:4-16. As part of that effort, he explained that the agents tried

---

[2] While Agent Destito spoke with Defendant, Agent Doud questioned Ms. Emery and Romnel Bethea, the vehicle's male passenger. He approached Ms. Emery first, identified himself and showed his badge, and asked if she would speak with him for a few minutes. She agreed, and they spoke for a few minutes while standing near her vehicle. Agent Doud did not order Ms. Emery to exit her vehicle and did not order her to speak with him. Although he spoke to her in a serious tone of voice, he did not raise his voice or threaten her. After speaking with her, Agent Doud asked Ms. Emery to wait on the front porch of her residence, while he spoke with Mr. Bethea. During both of these encounters, Defendant was standing near the agents' vehicle approximately fifteen feet away. There is no evidence that Defendant could hear Agent Doud's interactions with either Ms. Emery or Mr. Bethea.

to be out in the public observing and talking to individuals arriving from out-of-town. He asked whether a drug-sniffing dog would alert to Ms. Emery's vehicle and whether the agents would find illegal drugs. In response, Defendant began to cry. Agent Destito told her that he appreciated her honesty because most people were not honest with him, and he asked her where the heroin was. Defendant responded that it was in her purse. Agent Destito asked Defendant where her purse was, and she told him it was on the floor of Ms. Emery's vehicle. He asked if he could retrieve it, and she replied that he could. Agent Destito retrieved Defendant's purse, confirmed with Defendant that it belonged to her, and asked if he could look inside it. Defendant agreed that he could do so. Inside Defendant's purse, Agent Destito found a plastic bag that contained what appeared to be a large quantity of heroin. After Agent Destito recovered the heroin, he advised Defendant of her *Miranda* rights and asked if she would be willing to speak with him. Defendant agreed to do so. Agent Destito's relatively brief conversation with Defendant at 76 Traverse Place took place in a conversational tone. Defendant was neither threatened, nor physically restrained prior to her arrest.

While Agent Destito was talking with Defendant, Rutland Police Officer Jennifer Czachor arrived in uniform in a marked Rutland police cruiser at 76 Traverse Place, and she parked on the street. Officer Czachor described the scene at 76 Traverse Place as "very calm." *Id.* at 139: 3. She was directed to the front porch where Ms. Emery was standing, and she remained there with Ms. Emery and later with both Ms. Emery and Mr. Bethea until they were taken into custody. While waiting on the front porch, Officer Czachor and Ms. Emery engaged in a casual conversation during which, at one point, Ms. Emery asked if she could go inside her residence and Officer Czachor told her she could not. Officer Czachor credibly testified that she did not witness either Agent Doud or Agent Destito raise their voices, threaten the vehicle's occupants, or display their firearms.[3] Officer Czachor remained at 76 Traverse Place for no more than fifteen

---

[3] Officer Czachor's cruiser's video camera captured a portion of the incident starting at 8:48 p.m. Officer Czachor testified that she received the call to respond to the scene at 8:31 p.m., that it took her five minutes to drive there, that she arrived at 8:36 p.m., and that she started the cruiser

minutes and left the scene when the vehicle's occupants were arrested and transported to the Rutland police station, where Defendant was questioned for approximately one hour.

## II.    Conclusions of Law and Analysis.

The government contends that the agents' encounter with Defendant was consensual up until the time she was arrested.  Defendant responds that the encounter was not consensual, and that it was also not a lawful investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968), because it was not supported by a reasonable suspicion of criminal activity.

### A.    The Nature of the Encounter at 76 Traverse Place.

"[T]here are three types of encounters between police and individuals, each with different ramifications under the Fourth Amendment." *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992).  "The first type is a consensual encounter whereby an individual willingly agrees to speak to law enforcement personnel.  Such contact may be

---

video as soon as she arrived at 76 Traverse Place.  She could not explain why the timestamp for the start of her cruiser footage varies from her estimate of her arrival at 76 Traverse Place, nor could she explain why the first sixty seconds of her cruiser footage contain no audio.  The beginning of her cruiser footage depicts Agents Destito and Doud standing with Defendant in the street next to the agents' vehicle and Agent Doud leaving to arrest Ms. Emery and Mr. Bethea. Officer Czachor's cruiser video recorded Agent Doud stating to Ms. Emery and Mr. Bethea:

| Agent Doud: | OK.  Here's the deal.  You guys are under arrest for violating federal narcotics laws – specifically conspiracy to distribute heroin. |
|---|---|
| Ms. Emery: | Excuse me? |
| Agent Doud: | And you guys have from here to the police station to get your shit straight.  OK?  Because at the police station we are going to decide who is going to go into federal court in Burlington, and who's not.  So you got the distance from this house to that PD to figure out how you are gonna deal with the next ten years of your life.  I'm the one who locked up your cousin.  You got serious fucking problems. . . . |

There is no evidence that Defendant heard this exchange.

initiated by the police without any objective level of suspicion and does not, without more, amount to a seizure" under the Fourth Amendment. *Id.* (internal quotation marks and citations omitted). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002). "The second type of encounter" is "a limited investigative stop," pursuant to *Terry v. Ohio*, and must be justified by "a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Glover*, 957 F.2d at 1008 (internal quotation marks and citations omitted). "[S]uch investigative detentions are 'seizures' under the Fourth Amendment." *Id.* Finally, there is an arrest, which "must be based on probable cause." *Id.* The relevant factors for identifying whether a seizure has occurred include:

> the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) (internal quotation marks omitted).

In this case, the agents approached Defendant at night as she was preparing to exit a vehicle parked in Ms. Emery's private driveway. The agents stood on either side of the vehicle, which effectively blocked the vehicle's occupants from exiting it without the agents' acquiescence. *See Drayton*, 536 U.S. at 204 (noting that type of encounter depends in part on whether there was "intimidating movement" and/or "blocking of exits" by officers). When Agents Doud and Destito identified themselves, the vehicle's occupants knew that the "train people" who had followed them were in fact law enforcement officers. Agent Destito told the vehicle's occupants to leave their hands where the agents could see them. *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 340 (2d Cir. 2000) (concluding a suspect was "seized" because a reasonable person would have considered the police officer's request to be compulsory when the officer

pointed a spotlight at the suspect and told the suspect to "[c]ome here" and to show his hands), *overruled in part on other grounds by Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002). At the time, the agents' vehicle was partially blocking the occupants' vehicle from exiting the driveway.

Based upon the foregoing facts, it is arguable whether Defendant's initial encounter with the agents was wholly consensual. Her freedom of movement was limited to at least some degree, and a law enforcement officer had just issued her a command. A reasonable person in Defendant's position may not have felt free to terminate the encounter and leave the area. *See Drayton*, 536 U.S. at 201 ("If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."). Here, the court need not resolve the issue because any seizure of Defendant at 76 Traverse Place was a lawful *Terry* stop.

"Under *Terry*, a police officer may briefly detain an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (internal quotation marks omitted). A *Terry* stop "must be 'justified at its inception.'" *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quoting *Terry*, 392 U.S. at 20). "[T]he amount of suspicion needed to justify [a *Terry* stop] is less than a 'fair probability' of wrongdoing, and 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Id.* at 186-87 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). An officer must have "a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "While [an] officer may not rely on an inchoate and unparticularized suspicion or hunch, he is entitled to draw on [his or her] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him or her] that might well elude an untrained person." *Padilla*, 548 F.3d at 187 (internal quotation marks and citations omitted); *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) ("[W]hile a reviewing court cannot merely defer to police officers' judgment in assessing reasonable suspicion, the

court must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene.") (internal quotation marks omitted).

Although a close question, in this case the agents had a reasonable and articulable suspicion that the vehicle's occupants were engaged in drug trafficking based upon the totality of the circumstances. The agents were present at the Castleton Amtrak station in response to intelligence that drug couriers were disembarking there to avoid law enforcement surveillance at the Rutland Amtrak station. The agents observed a lone vehicle parked in a gravel parking lot which Agent Doud had not seen previously used by vehicles. Both agents observed the vehicle's occupants looking nervous and avoiding eye contact when the agents walked around the vehicle.[4] *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (explaining the Supreme Court's "cases have . . . recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *see also Glover*, 957 F.2d at 1010-11 (concluding reasonable suspicion that a suspect was a drug courier when the suspect exhibited nervous behavior upon arrival at the bus terminal, including sweating, shaking, and looking around); *United States v. Thompson*, 941 F.2d 66, 70 (2d Cir. 1991) (concluding suspect's "nervous behavior, frantic gestures, circumlocutions about the station, and attempts to hide the fact that she was traveling with another person . . . provided the officers with reasonable and articulable suspicion to warrant her detention"); *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir. 1984) (concluding stop of van for suspected marijuana trafficking justified by reasonable suspicion when, among other factors, the driver "diverted his face when he passed the officers' vehicle").

---

[4] The agents were apparently incorrect in their belief that Ms. Emery was nervous and avoiding eye contact. However, "[t]he constitutional validity of a stop is not undermined simply because the officers who made the stop were mistaken about relevant facts." *United States v. Jenkins*, 452 F.3d 207, 212 (2d Cir. 2006) (concluding seizure was justified at its inception because officers reasonably believed that SUV lacked license plates and was consequently violating state law, even though officers subsequently discovered SUV had valid temporary plates); *see also United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) ("[O]nly the facts available to the officer at the moment of the seizure may be evaluated in [the] review of [reasonable suspicion].") (internal quotation marks omitted).

Unlike the occupants of other vehicles that evening, the lone vehicle's occupants did not leave their vehicle to greet the arriving passengers on the station's platform. Based upon their training and experience, the agents knew that drug traffickers often did not immediately approach a courier who was disembarking from mass transit but, instead, waited to see whether the courier was apprehended by law enforcement before making contact with him or her. *See United States v. Garcia*, 339 F.3d 116, 119 (2d Cir. 2003) (explaining conduct consistent with drug trafficking, such as engaging in "counter-surveillance" to avoid detection, supports finding of reasonable suspicion); *see also United States v. Gaviria*, 740 F.2d 174, 182 (2d Cir. 1984) (concluding suspect's "cautious[]" behavior, including "looking up and down the block before proceeding onto the street," supported reasonable suspicion). Although this conduct was equally consistent with a pre-arranged plan to meet in the parking lot for innocent reasons, "[e]ven conduct that is as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." *Padilla*, 548 F.3d at 187 (internal quotation marks omitted); *see also United States v. Simmons*, 560 F.3d 98, 107-08 (2d Cir. 2009) (concluding conduct consistent with innocence, which included the defendant walking toward the officers with his hands in his pockets, supported a reasonable suspicion necessary for a *Terry* stop because the "conduct [also] could have suggested to the officers that [the defendant] was concealing a weapon").

Defendant raised no immediate suspicions as she disembarked from the train beyond her lack of luggage. However, she attracted the agents' attention when she proceeded without hesitation to the lone vehicle that the agents considered suspicious. *See United States v. Hamilton*, 978 F.2d 783, 785 (2d Cir. 1992) (concluding reasonable suspicion when suspect arrived "on a bus known to be favored by drug couriers" and thereafter "evasively attempted to leave via the bus parking lot rather than the terminal"). Because the agents knew that the train had originated in Philadelphia and had passed through New York City (both source cities for narcotics), Defendant's arrival with only a purse appeared suspicious. *See United States v. Lee*, 916 F.2d 814, 820 (2d Cir. 1990) (concluding reasonable suspicion when, in part, officers first observed suspect carrying a

11

suitcase "that appeared to be virtually empty" and traveling to "a destination regarded as a source for drugs"); *see also United States v. Hooper*, 935 F.2d 484, 493-94 (2d Cir. 1991) (noting suspect was last of passengers to deplane from a flight arriving from a "source city" and that he could not unlock his own suitcase as "suspicious" behavior, among other factors, supporting a reasonable suspicion suspect's suitcase "contained contraband").

When the agents decided to follow the lone vehicle, they may have been acting on a mere hunch. However, when they traced the vehicle's license plate to a location in Rutland in close proximity to an area associated with drug trafficking and a previously executed state search warrant, their hunch began to ripe into a reasonable suspicion of criminal activity. *See Wardlow*, 528 U.S. at 124 ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); *see also United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) (evaluating physical proximity to a high-crime area, as well as temporal proximity to crime scene, to conclude officers had reasonable suspicion). This suspicion was enhanced by their determination that 76 Traverse Place was only a couple of blocks from the Rutland Amtrak station. There was thus no readily apparent explanation for Defendant's decision to get off the train in Castleton, and Ms. Emery and Mr. Bethea's decision to meet her there, when the Rutland Amtrak station appeared clearly more convenient. The desire to avoid law enforcement at the Rutland Amtrak station provided a reasonable explanation for this unusual path of travel. *See Sokolow*, 490 U.S. at 8 (noting an "evasive" or "erratic" path of travel by suspect may support reasonable suspicion); *see also United States v. Singh*, 415 F.3d 288, 294 (2d Cir. 2005) (noting that officers may take into account "usual traffic patterns"); *United States v. Masterson*, 2009 WL 2365334, at *4-5 (D. Vt. July 29, 2009) (finding a reasonable suspicion of drug smuggling when suspect "was driving a rental car with an expired rental agreement, and had taken an indirect route to his final destination for a questionable reason," and when suspect was "extremely nervous" and "failed to make eye contact").

The Second Circuit "has held that the reasonable suspicion inquiry must ask if the conduct would appear suspect to one familiar with the practices of narcotics couriers[.]" *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal quotation marks omitted); *see also Terry*, 392 U.S. at 27 ("[I]n determining whether the officer acted reasonably . . . , due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."). In this case, based upon the "whole picture," the agents had a reasonable suspicion based on articulable facts that one or more of the occupants of the suspicious vehicle may be engaged in drug trafficking. *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (internal quotation marks omitted); *see also Padilla*, 548 F.3d at 187 ("*Terry* recognized that a series of acts, each of them perhaps innocent in itself, can when taken together warrant further investigation.") (internal quotation marks and alterations omitted). This provided a sufficient basis under the Fourth Amendment for Agent Destito to approach Defendant and ask her if he could speak with her, even if he was momentarily detaining her in doing so. *See Florida v. Royer*, 460 U.S. 491, 498 (1983) ("[A] reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop."); *see also United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007) ("A *Terry* stop represents an intermediate response allowing police to pursue a limited investigation[.]").

**B.      Whether the Investigative Stop Was Reasonable.**

"Even if articulable suspicion supports an investigatory stop . . . , the Fourth Amendment demands that the scope and duration of the detention be reasonable." *Bailey*, 743 F.3d at 336; *see also United States v. Sharpe*, 470 U.S. 675, 682 (1985) (explaining legality of investigatory stop is subject to "a dual inquiry" of whether the stop was justified at its inception by a reasonable suspicion that criminal activity has occurred or is about to occur and of whether the stop was "reasonably related in scope to the circumstances which justified the interference in the first place") (internal quotation marks and citations omitted).

Here, the entire encounter preceding Defendant's arrest took place in less than a half hour. *See United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (concluding thirty-minute detention was not too long when the agent "made speedy and appropriate inquiries in a reasonable way"). During that time, Agent Destito explained to Defendant the agents' drug interdiction efforts and asked Defendant questions to determine her potential involvement in drug trafficking.

In response to Agent Destito's brief questioning, Defendant almost immediately confirmed that she was in possession of heroin and that it was located in her purse. She did so in response to a question regarding whether a canine would alert to the vehicle in which she was travelling, and not in response to any threats, accusations, or displays of force, other than the agents' mere presence. *See Royer*, 460 U.S. at 500 ("[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."); *see also United States v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010) (concluding "questions" about "comings and goings" of suspect are reasonable); *Gaviria*, 740 F.2d at 182 (concluding *Terry* stop minimally intrusive and thus reasonable because it lasted only ten to fifteen minutes, occurred in a public place, the agents did not exhibit their weapons or raise their voices, and the suspects were not physically restrained, or intimidated, harassed, or humiliated by the agents). The *Terry* stop of Defendant was thus "reasonably related in scope and duration to the circumstances that justified the stop in the first instance." *Glover*, 957 F.2d at 1011, 1013 (concluding that detaining the suspect for approximately thirty minutes with his bags to conduct brief questioning and to await the arrival of the narcotics dog was a limited intrusion and was thus a permissible *Terry* stop).

### C.     Whether Defendant Consented to the Search of her Purse.

If the encounter was "a justifiable *Terry*-type detention," then "consent, if voluntary," justifies a search conducted during that detention. *Royer*, 460 U.S. at 501. "The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of

14

authority." *United States v. Moreno*, 701 F.3d 64, 76 (2d Cir. 2012) (internal quotation marks and citations omitted), *cert. denied*, 133 S. Ct. 2797 (2013).

"Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). A court should weigh "the characteristics of the accused and the details of the interrogation," including the age, education, and intelligence of the accused; the length and nature of detention; the repeated and prolonged nature of the questioning; and any advisement of constitutional rights. *Schneckloth*, 412 U.S. at 226. Other factors include "whether there was a show of force [and] whether the agents told the defendant that a search warrant would be obtained." *United States v. Munoz*, 2013 WL 6638922, at *4 (S.D.N.Y. Dec. 18, 2013) (internal quotation marks, citations, footnotes, and alterations omitted).

When Agent Destito asked Defendant whether he could retrieve and look in her purse, his inquiry was phrased as a request, not a command. *See Drayton*, 536 U.S. at 206 (holding consent following seizure to be voluntary when officer "asked for . . . permission" to search and "[n]othing" the officer "said indicated a command to consent to the search"). Although Agent Destito did not advise Defendant she had the right to refuse to consent, "the Constitution does not require 'proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search.'" *United States v. Mendenhall*, 446 U.S. 544, 558-59 (1980) (quoting *Schneckloth*, 412 U.S. at 234); *see also United States v. Garcia*, 56 F.3d 418, 422-23 (2d Cir. 1995) (noting "knowledge of the right to refuse consent" is only a "factor" (albeit an important one) in determining whether consent was voluntary).

When asked for her consent, Defendant was not handcuffed or physically restrained, and she had not been subjected to any prolonged interrogation or deprivation of any kind. To the contrary, Agent Destito asked her only a few questions in a polite and conversational manner on a public street within sight of the vehicle's other occupants. Although Defendant was crying during the encounter, she was not distraught or hysterical, and there is no evidence that she failed to appreciate the nature of Agent

Destito's request and the consequences of complying with it. She expressed no hesitation in giving consent, and no promises were made to her to obtain it.

Based upon the totality of the circumstances, Agent Destito "'had a reasonable basis for believing that there had been consent to the search.'" *Isiofia*, 370 F.3d at 231 (quoting *Garcia*, 56 F.3d at 423). Defendant's consent to the search of her purse was thus voluntary. Once Agent Destito discovered the heroin in Defendant's purse, he had probable cause to arrest Defendant. Accordingly, the encounter at 76 Traverse Place was justified at its inception, reasonable in scope and duration, and did not otherwise violate Defendant's constitutional rights. Defendant's subsequent statements at the Rutland police station, made after she received her *Miranda* rights, were thus not tainted by any prior illegality.

## CONCLUSION

For the foregoing reasons, the court hereby DENIES Defendant's Motion to Suppress Evidence (Doc. 19).

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 21st day of May, 2014.

Christina Reiss, Chief Judge
United States District Court

16